Number 182032 United States v. Ross McLellan, on behalf of the appellant Ross McLellan I would request three minutes for rebuttal. Thank you sir. Appellant McLellan was convicted of both wire and security fraud charges and a conspiracy to violate both statutes. These allegations revolved around what was essentially a foreign scheme to defraud where there was evidence of misrepresentations and misleading statements made by executives of State Street who were stationed in the London office to six foreign clients of State Street, largely promising them that their charges for transitioning one set of investments to another and the different transactions that would be associated would be subject to an explicit fee when there was an intention to add a nondisclosed markup to primarily the fixed income transactions. Judge Sorokin, I want to first address the wire fraud charges. Can I just ask you one question about your summary? Of course your honor. Fine to me except for I understand the foreign part of it but I thought that there was considerable evidence of domestic conduct here. Is that not so? It was predominantly a foreign scheme to defraud. There was evidence that Mr. McLellan who was in Boston and hierarchically was vertically, these were the subordinates of his. He was globally ahead of the portfolio solutions group. That there were emails to him which kept him apprised of the charging negotiations. There were several emails in terms of one of the six transactions where there was give and take between he and Mr. Pennings and then after State Street was selected and I contend the essence of the scheme to defraud was in relation to the competitive exchanges between the banks in terms of being selected. Thereafter Mr. McLellan was involved in some of the U.S. security transactions where the markup was added to the market price for the transaction. Judge Sorokin's wire fraud instructions only required the jury to find one domestic wire saying it didn't have to be even essential to the wire fraud. It simply had to be in furtherance or carrying out the objectives of the underlying scheme to defraud. The district court denied my request that issues of extraterritoriality of where the predominant wire fraud occurred be presented to the jury. The issue and it's one of first impression for this circuit and it's an issue that has divided other circuits primarily the 3rd and 2nd circuits and various district courts in the 9th and 11th circuits is whether 1343 the statute was intended by Congress to be applied extraterritorially that was the position of Judge Sorokin or whether instead the jury needed to be instructed as to whether there was on the facts of this case a domestic application of the statute. If there were acts in the United States sufficient to constitute a crime, did they have to go into the extraterritoriality at all? They do on wire fraud not on money laundering for instance where Congress has given a clear indication that they intended the U.S. criminal law to be applied abroad but there was a presumption against extraterritoriality and the Supreme Court in the Morrison case in 2010 set up a two-step test. The first step was is there a clear unambiguous if you will intention set forth by Congress explicitly that this statute was intended to always be applied extraterritorially. But following up on what Chief Judge Howard indicated, is it there on the record that some of these acts took place in the United States by your client? Yes, there is evidence in the light most favorable to the government that Mr. McClellan did have some participation in terms of knowing and not stopping approving, Mr. Frank calls it directing, I call it not stopping these foreign miscommunications, misrepresentations to the client. Both Penning and Boomgard were his subordinates. The jury only had to find one random isolated non-essential domestic wire and that ended the issue because Judge Sorokin mistakenly we contend believed that all wire frauds are intended by Congress to be extraterritorial. The Second Circuit when addressing the wire fraud statute in contrast to the Third Circuit in contrast to Judge Sorokin said you need to look beyond the language foreign commerce which is the language and instrumentality and interstate of foreign commerce. Justice Morrison said that's not enough to establish that Congress intended extraterritorial effect. We need to look the Supreme Court said to a second test which looks to the focus of the statute and that's a jury question that needs instructions that the defense was denied in this case and given the nature of the underlying offense where all of the misrepresentations were made by Penning and Boomgard to foreign clients. A jury if they were properly instructed could well have found an insufficient nexus to the United States wire fraud statute. But my point is assuming there was sufficient evidence to show that there was a crime committed in the United States the issue of extraterritoriality at best a harmless error not giving an instruction. It would be harmless error I submit if there was an overwhelming or predominant amount of United States conduct. Here there was some United States conduct. Isn't that enough? Does it have to be overwhelming? It's enough to go to the jury with the proper instruction that would have permitted the jury to find that Mr. McClellan's domestic wires his communications with Europe were not a central core component of the wire fraud which is the second circuit test. But some instruction is needed. It's such a deeply fact-finding issue that it can't be resolved on the first step of the two-step Morrison test. It needs as the second circuit said what is the focus? There the test was a domestic wire and furtherance of the underlying scheme to defraud but more that those domestic wires were core components of the scheme to defraud. Here the facts are consistent with the jury believing that the scheme to defraud essentially was complete with the misrepresentations made in this competitive effort to get these foreign sovereign wealth funds or pension funds to hire State Street and they were all done by others. Mr. McClellan had no communications and there was no domestic communications with any of the six victims. It doesn't mean he's entitled to a rule 29. It means that he's entitled to a jury finding which he wasn't given because of Judge Sulokin's belief that all wire frauds are intended to be extraterritorial which I submit is in conflict with the second circuit and in conflict with Morrison's statements that foreign commerce language in the statute is not sufficient. The second set of charges was the security fraud convictions and here the statute rule 10b-5 the charges the instructions require proof beyond a reasonable doubt that the misrepresentations which again were made to European clients by Mr. McClellan's subordinates in Europe were in connection with the fraud. Mr. McClellan was not entitled to purchase or sale of any security. The government called four witnesses from these foreign entities. Each of them testified that they received State Street's response to their RFP, they evaluated the response, they trusted State Street's representations that all the charges would be explicit and there would only be a fixed charge whether it was a management fee. But they all said when asked by the government what would you have done had you known that State Street was going to add these undisclosed markups to the transaction fees they said we would have hired JP Morgan or Citibank or one of the other competitive banks. There are cases that we've provided in the brief saying that misrepresentations that solely go to the choice of broker, the choice of investment manager, the choice here of a transition manager are not sufficient to be in connection with the purchase and sale of a security. These are unique facts where State Street had nothing to do with giving advice about what to buy, what to sell, what to hold. Those decisions were all made by the client. These misrepresentations had zero to do with the selection of a stock to sell, the selection of a bond to buy. They were only about getting State Street the job to move one set of assets to another set at the lowest possible cost. The government says but the misrepresentations that got State Street hired were inextricably intertwined with changing the price from a market price to a market price with some markup. But here the four victim witnesses, none of them testified that had they known that State Street intended to mark up the securities by a relatively small amount, one basis point, two basis points, that they would have changed their investment strategy, that they would have not bought or sold any specific security, that they would have acted in any way different. They all had investment advisors, they all made their own decisions about what to buy and sell. The security fraud statutes have been carefully narrowed. The Supreme Court in Chadbourne, this circuit in Hildago Velez, and a variety of district court cases that we've provided to the court, several 11th Circuit cases that squirrelly hold the misrepresentations that lead to the selection of one broker rather than another, one broker. One manager rather than another, are not, quote, in connection with the purchase and sale of any security. If the RFPs had identified the securities, would that have been enough of a connection under your approach? Respectfully, only if the added markup, if the victim witnesses knew and testified that was material to their decision whether or not to sell or buy or hold or the timing of their sale or purchase, but there was no such testimony. This again is a unique circumstance where the selected transition managers simply have nothing to do with the selection of assets, nothing to do with what to buy and what to sell, and therefore under the language of 10b-5 and the language of the charging indictment, this is simply one step outside of the scope of the security fraud statutes. Thank you very much. Thank you. Good morning, Your Honors, and may it please the Court, Stephen Frank from the United States. The defendant is asking this Court to make three unprecedented holdings that we submit are contrary to established Supreme Court and circuit law. First, to narrow the reach of the securities fraud statutes in a way that is contrary to explicit Supreme Court precedent. Second, to similarly narrow the reach of the wire fraud statutes such that it would not reach the criminal conduct of an American defendant who conducted his scheme from right here in Boston. And third, although he didn't address it in his remarks, to order the government to seek evidence from abroad using its powers pursuant to mutual legal assistance treaties with two different countries, despite the fact that this Court has previously concluded that it lacks subject matter jurisdiction to review the actions of the Attorney General pursuant to those treaties. Judge Toria, I'd like to start with your question to Mr. Weinberg about whether, under the wire fraud statute, acts in the United States would be sufficient to resolve this without reaching the question of extraterritoriality. And I would submit to you that the answer to your question is yes, and that gets to Chief Judge Howard's question about whether there was considerable evidence of domestic conduct here, and the answer to that is also resoundingly yes. This defendant specifically approved and directed the misrepresentations that were made to State Street's clients. Two cooperating witnesses testified to that, testified that he approved each of the misrepresentations and that he directed the scheme. He also personally applied the markups here in Boston. He directed traders to apply those markups, and he directed traders to mislead their colleagues, and thus the bank's clients, about those markups. He also directed the cover-up of the scheme, and emails and calls, recorded calls, corroborated all of that. So the government would submit that if all of the elements of wire fraud are met by domestic conduct, as they are in this case based on facts that were really not much disputed, then that satisfies a domestic application of the wire fraud statute, and the court doesn't even need to reach the question of extraterritoriality. To the extent that the court does reach that question, we believe the answer to that question is provided by the Supreme Court's decision in the Pasquantino case, and by this court's decision in the Lyons case. In Pasquantino, although the court there did not conclude that the wire fraud statute has extraterritorial effect, it did conclude that the statute is surely not one in which Congress had only domestic concerns in mind. In the Morrison case, the Supreme Court specifically and approvingly referred to Pasquantino in distinguishing the wire fraud statute, which it concluded deals with schemes to defraud simpliciter, from the securities fraud statute, which deals only with schemes in connection with the purchase and sales of securities that trade in the United States. In fact, in Morrison, in his concurrence, Justice Breyer suggested that although the securities fraud statute did not apply there, the wire fraud statute might nonetheless apply. So we would submit that although the court doesn't need to reach that conclusion, Pasquantino provides an answer about extraterritoriality. And similarly, in the Lyons case, concerning the Wire Act, which has very similar language concerning interstate and foreign commerce, this concluded that that language, and that was a post-Morrison decision, this court concluded that that language was sufficient to give the statute extraterritorial reach. What about the claim that the instructions as given would have permitted conviction based on any one random act, domestic act? I don't think that that's an accurate, respectfully, I don't think that's an accurate characterization of the instruction. In fact, the instruction was an ordinary wire fraud instruction that this court has repeatedly upheld. But in any event, there was extensive evidence of domestic conduct. And I think that the question of whether the wire fraud statute applies extraterritorially, even if this court were to conclude that it did, does not necessarily mean that the question of extraterritoriality goes to the jury. It's not necessarily dissimilar from venue, which, although this court hasn't explicitly addressed the question of whether venue goes to the jury, Judge O'Toole, in the Carpenter case, discussed it at length at the district level and suggested that that question, that venue question, is one that, like many other disputes that rely on underlying facts, can be resolved by the district court judge without necessarily going to the jury. And I think this is no different from that. With respect to the securities fraud, the defendant is essentially arguing that because the alleged misrepresentations didn't go to the choice of which particular securities to purchase or to sell, that therefore this is not an appropriate application of the securities fraud statute. And that is simply not the law. Accepting that suggestion would constitute an unprecedented narrowing of the securities fraud statute, effectively to say that that statute cannot reach a banker who misrepresents to his client the price at which that client is buying every single security it buys and the value that it's getting for every single security that it sells. In case after case, the Supreme Court has suggested, has held, that the in connection with language of the securities fraud statute should be given broad interpretation, flexible interpretation, so as to be consistent with the underlying purpose of that statute, which is to protect investors. Has it said that in criminal cases? It has, actually. Well, I can't point to a specific criminal case, but in the Zanford case, which was an SEC case, the court said explicitly that there was no need for the misrepresentation to concern the value of a particular security. And in other words, I think what that is suggesting, and the same analysis would apply whether Zanford was an SEC case, a civil case, or a criminal case, is that the securities fraud statute is not limited to misrepresentations in connection with the selection of securities, but to misrepresentations in connection with the purchase and sale of securities, whether that relates to the selection or whether that relates to something else, such as the value. And in addition, in the Trois case, the court explicitly said, and that case was a civil case, again, a private securities action, which concerned the Securities Litigation Uniform Standards Act. And the court there said that its construction of in connection with, which was simply whether the transaction needed to be in connection with a covered security, principally one that trades on a national exchange, versus an uncovered security for purposes of the preclusive effect of that statute, the court said that its construction of in connection with would not preclude the government from bringing any sort of criminal case that the government has heretofore brought. So I think with respect to the in connection with language, whether it's in a criminal case or in a civil case, the court has been very clear that the language has to be given broad application to affect the purposes of the act. And... Can you refresh my mind on something? Did the Lyons case involve the same statute that we have here? No, Your Honor. The Lyons case involved the Wire Act, not the Wire Fraud Act. But the language that's at issue, the language about transactions in interstate and foreign commerce is virtually identical in the two acts. But is that sufficient just because the language is the same to interpret it the same? Or do you have to go into the reasoning of why that statute was enacted? I think context does matter. I think Your Honor is correct. And the court explicitly said in Morrison that context matters. And that's why we would also point the court to the Supreme Court's holding in Pasquantino in which the court specifically did address the Wire Fraud Act and suggested that in that act, Congress clearly did not have simply domestic concerns in mind. So I think it's the combination of those two. Getting back to the in connection with language, the defense would have the court believe that the alleged misrepresentations here were limited to the choice of State Street as a broker-dealer. And that's why they point to those 11th Circuit cases where the facts of those cases were limited to the choice of the bank. But that was not the situation here. The fraud began with the selection of State Street as the broker-dealer. But the mechanism of the fraud was the application of hidden commissions to every single purchase and every single sale of a security. Without the purchase and sale of a security, the fraud would simply not have happened. If the misrepresentations had never been put into effect through the purchase and sale of securities, there would have been no fraud. And so that's why those 11th Circuit cases, one of which dealt with accounting fraud, and there were no misrepresentations communicated to investors, nor was there any purchase or sale of a security implicated. And the other of which dealt with processing fees, where again there was no misrepresentation to the investors, no loss to the investors about the amount of the processing fee. Those cases are really not applicable on the facts to this case. And I actually don't think that they're even inconsistent with the conclusion of this Court, that where the fraud goes beyond simply the selection of the broker-dealer to the application of hidden commissions to every single purchase and every single sale, that that is plainly securities fraud. And that's what the 2nd Circuit and district courts in the 2nd Circuit have repeatedly concluded with respect to cases involving excessive commissions applied to bond trades. Those cases did not concern which bonds were traded or the selection of bonds. They concerned excessive commissions applied to those trades, and the courts have had no trouble concluding that those were misrepresentations that were in connection with and material to those purchases and sales. Unless the Court wishes me to get into the remaining issue about the mutual legal assistance treaties, I'd rest on my papers. Thank you. Thank you. Focusing first on the 1343 issue, certainly there was evidence in the light strongest to the government that Mr. McClellan had an involvement as the vertically hierarchical person that approved, government says directed, but the jury didn't have to believe that evidence. But the jury needed as an instruction to determine whether or not there was sufficient proven, believed, domestic activity to warrant the extension of the wire fraud statute on this case. This is not a legal ruling for the judge to essentially usurp what is at essence fact-finding. Governments never before argued that this wasn't a jury issue. This is a classic fact issue. Do you believe the evidence of the domestic contacts? Do you believe the domestic wires were important to a core component of the fraud? If you don't, you can still believe that Mr. McClellan had some responsibility, but that the offense was foreign. Here there's certainly enough foreign evidence of the foreign scheme to the fraud where all the misrepresentations are foreign to make it a jury issue, absent the legal error that Judge Sorokin, based in part on the Lyons case, believed that all wire frauds were extraterritorial by the intention of Congress. 1084 is very different than 1343 because the wire that's in the Gambling Wire Act constitutes the entirety of the crime. What's the communication about gambling on a wire? Here the wire is but one element that needs to further or be part of the carrying out of an underlying scheme to defraud. These are very different statutes. The Lyons Court never even discussed Morrison and certainly didn't have the advantage of all of the case law that has come since, including two further Supreme Court cases, RJR Nabisco and Western JICO, that talk about the two-step Morrison test. The Second Circuit in the European Community case at 764 Fed Third of footnote 11 says Morrison essentially silently overruled the dictator in Pasquatina because Morrison set up this two-step test for determining extraterritoriality, a test that wasn't used in Pasquatina where almost all of the conduct was domestic. The instruction on the wire fraud at appendix 2595 shows that a single random wire not essential to the fraud would be sufficient for 1343. Finally, in terms of the Title 15 issue, this circuit in the Hidalgo-Velez case when describing the Chadbourne case with Justice Breyer's opinion said the following, if I can just end with this quote, It held that Justice Breyer's opinion broke new ground in illuminating the contours of the in-connection requirement. It held that a fraudulent misrepresentation or omission is not made in connection with the purchase or sale of a covered security unless it is material to a decision by one or more individuals to buy or sell a covered security. In other words, the in-connection requirement is satisfied only where the misrepresentation makes a significant difference to someone's decision to purchase or sell a covered security. The testimony of Dean Johnson and all of the others when asked, what would you do if you knew about the State Street's intent to add a hidden markup to the explicit fee, all four witnesses, Johnson, Kiernan from Dutch Doctors, O'Callaghan from NTMA, McKnight from Royal Bank, all said the same thing, we wouldn't have hired State Street. None of them said that any investment decision would have been altered. Thank you very much.